## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MAINE

| | |
|---|---|
| SARAH M. CHAGNON | ) |
| Plaintiff, | ) COMPLAINT for a Civil Case |
| v. | ) |
| | ) Civil No. 2:23-cv-389-LEW |
| TEGAN S. TESKE | ) |
| And | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| AMANDA N. GUNTER | ) |
| And | ) |
| | ) |
| BRENDA S. DIEDERICH | ) |
| **Defendants** | ) |

Plaintiff, Sarah M. Chagnon hereinafter (the "Plaintiff") or ("Chagnon"), for her

Complaint against Defendants, Tegan Teske ("Teske"), Amanda Gunter ("Gunter"), and Brenda

Diederich ("Diederich"), collectively hereinafter referred to as ("Defendants") alleges as follows:

### I.    NATURE OF ACTION

1.    Plaintiff, Sarah M. Chagnon, initiates this legal action to expose the deliberate and

abhorrent harm inflicted upon her by Defendant Teske, and the morally repugnant actions

committed by Defendants Gunter and Diederich. The extent of their egregious conduct knows no

bounds, encompassing heinous offenses including domestic violence, rape, brutal assault,

battery, intentional and negligent infliction of emotional distress, conspiring to cause emotional

distress, and invading her privacy in unspeakable ways. These actions have exacted a severe toll,

leading to immeasurable suffering, profound and enduring emotional distress, unrelenting

torment, grievous personal injury, shattering familial bonds with Plaintiff's children, loss of livelihood and property, forced relinquishment of custody of her children, and subjecting her to public scorn, hatred, and merciless ridicule.

2.      In pursuing this legal action, Chagnon endeavors to not only establish the legal culpability of the Defendants for the deliberate and malevolent harm they have inflicted but also to clear her tarnished reputation. She aims to cast a glaring light on the vicious cycle of domestic violence, illuminating why victims, like herself, are coerced into retracting their reports of abuse after enduring years of torture and maltreatment.  Crucially, it is vital for both the judicial system and society at large to grasp the covert manipulation and dominance wielded by abusers such as Teske that can blind victims to their plight, making it nearly impossible to break free from the shackles of abuse. Chagnon seeks to illustrate that she, like countless others, could not readily perceive the unfolding horrors and the manipulative tactics employed against her by Teske while stuck in the cycle of abuse.

3.      Furthermore, Chagnon aims to hold accountable the horrifying involvement of Teske's family members Mother, Brenda Diederich and ex stepsister, Amanda Gunter in perpetuating her ordeal as a domestic violence victim. Shockingly, they actively championed his abusive actions or turned a blind eye to her distress, demonstrating a callous disregard for her well-being.

4.      This reprehensible support, whether through their direct complicity or indifference, further ensnared Chagnon in her nightmarish circumstances, perpetuating Teske's abuse and intensifying the unspeakable trauma she had to endure. Diederich and Gunter not only enabled Teske but themselves became active perpetrators of abuse, brutally adding to the torment inflicted upon Chagnon. This underscores the utmost importance of acknowledging collective

responsibility in confronting and eradicating the deeply disturbing scourge of domestic violence from our communities and placing a priority on protecting victims of intimate partner violence.

## II. PARTIES

5.      The Plaintiff Sarah M. Chagnon is an individual and citizen of the State of New Hampshire.

6.      The Defendant Tegan Teske is an individual and citizen of the State of Maine.

7.      The Defendant Amanda Gunter is an individual and citizen of the State of Maine.

8.      The Defendant Brenda Diederich is an individual and citizen of the State of Kansas.

## III. JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this civil matter pursuant to 28 U.S.C. § 1332(a)(1): because there is no common citizenship between the Plaintiff and Defendants and the amount in controversy is in excess of $75,000, which does not represent the full value of damages suffered by Plaintiff.

10.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b): because all defendants are residents of the State of Maine and a substantial part of the events giving rise to Plaintiff's claims occurred in this district and relate to the tortious conduct of each Defendant, who acted individually and in concert, jointly and severally, to injure Plaintiff.

11.     Plaintiff suffered injuries alleged herein in the State of Maine, as well as in the State of New Hampshire.

## IV. GENERAL ALLEGATIONS

### Domestic Violence Perpetrated By Defendant Teske

12.     Plaintiff Chagnon met Defendant Teske  in 2008, when he was stationed in

Portsmouth, New Hampshire on the Greenville submarine for the US Navy. At the time, Chagnon was living and working in New Hampshire as a special education teacher. Thereafter, a relationship developed and in a little over a year's time, the parties were engaged.

13.    In 2009, the nightmare began to unfold when the parties purchased a home together in Kittery, Maine. During this period before the marriage, Teske began asserting horrifying control over Plaintiff, subjecting her to a barrage of domestic violence, including physical abuse, rape, sexual violence, forcible touching, chilling threats of death and severe bodily harm.

14.    Teske's brutality transcended mere violence, spiraling into a realm of nightmarish horror. Teske took pleasure in hurling Chagnon about like a rag doll within the very walls that were meant to be her sanctuary. On one occasion, he cruelly brandished a knife, pried back her fingers to force it into her hand and demanding she plunge it into her own wrists; telling her she should just kill herself because she was such a fucking loser, drawing blood and creating permanent scarring. In a macabre twist, Teske also employed Windex to blind and choke her, dragging her down a flight of stairs to the basement where he relentlessly pummeled and kicked Chagnon's fragile abdomen, all the while verbally demeaning her and leaving her body marred with bruises and agony, attempting to take off her engagement ring. Teske's outrageous conduct was just a taste of what was yet to come during the parties' marriage.

15.    The abuse was cyclical in nature consisting of a period of: 1) tension building between the parties where Chagnon walked on eggshells in fear of angering Teske; 2) a lashing out by Teske resulting in a verbal or physical attack, threat of violence or an act of humiliation; and often 3) a honeymoon phase when Teske would apologize, promise to reform himself, buy gifts or be extra affectionate to "make-up" for the abuse.

16.     The parties married in July 2010 and had two children. Their oldest child born in 2012 and the youngest child born in 2015.

17.     In November of 2013, shortly after their first son was born, they moved to a new home in Eliot, Maine

18.     During their marriage, Teske subjected Chagnon to repeated and frequent acts of violence including physical violence, sexual violence, emotional and psychological aggression, (including coercive tactics) constituting domestic violence and/or intimate partner violence.[1]

19.     Teske also perpetrated acts of physical and emotional aggression against the party's minor children and kept the family living in a constant state of tyranny.

20.     Teske's  offensive and aggressive behavior was exacerbated by his chronic drinking, pornography and sex addiction, and excessive video gaming, which contributed to an atmosphere of unease, anxiety, and fear.

21.     Throughout the marriage, Teske's abusive conduct involved the intentional use of physical force and included but was not limited to pushing, shoving, throwing, grabbing, choking, shaking, hair-pulling, slapping, punching, hitting, forced sexual penetration, using a weapon (gun, knife, and other objects), and using his body, size, and strength against Chagnon to terrorize and retain control over her.

22.     Teske raped Chagnon numerous times throughout the parties' marriage.  One particular rape  occurred when Chagnon was severely ill with bronchitis and a lung infection. She was completely defenseless and struggling to breathe at the time. This single rape exacerbated her condition, making her even more ill and prolonging her recovery for many

---

[1] The Centers for Disease Control and Prevention (CDC) identifies four types of intimate partner violence—physical violence, sexual violence, stalking, and psychological aggression. see Intimate Partner Violence Surveillance: Uniform Definitions and Recommended Data Elements, Version 2.0. [3.04 MB, 164 Pages, 508].

months.

23.     Teske, an individual possessing exceptionally advanced computer and technological expertise, consistently threatened to secretly record private moments of the couple in their bedroom without Chagnon's approval.

24.     Teske also threated to secretly record him raping Chagnon and then to upload these recordings on the internet to generate financial gains.

25.     Teske also confessed to finding pleasure and delight in editing the videos to emphasize the most perverse and violent parts, catering to an audience with darker inclinations, including rape hostage fantasies, young girls he purportedly solicited for prostitution when stationed in Guam on the Greenville submarine and an infatuation with stepsister porn.

26.     Teske's behavior also included expressive aggression (e.g., name calling, humiliation, degrading, acting angry in a way that seemed dangerous).  Teske also limited access to money, friends, and family. He excessively monitored Chagnon's whereabouts and communications, monitored and interfered with her electronic communication (e.g., emails, instant messages, social media) without permission, made threats to harm and kill himself and threats to harm Chagnon, the minor children and the family pet.

27.     Chagnon was the sole caregiver of the children during the marriage and after separation, while Teske wanted little to nothing to do with caring for the children. While together, Teske spent most of time in his office playing endless hours of video games and drinking alcohol when he wasn't at work.

28.     Teske never fed, bathed, or spent time with the children and refused to wake up at night when the children were sick and or hungry.  Chagnon, who had two complicated pregnancies which both resulted in painful C-sections was not able to pick up her almost 10

pound son after his birth and was left on the floor on a mattress to care for both him and their three year old son while Teske ignored her pleas to help when the baby cried at night and was told to "*shut that fucking thing up so I can sleep.*"

29.    Teske often told Chagnon that he *let her have* kids *so she would have a hobby and leave him the fuck alone,* or words to that effect.

30.    After the birth of their youngest son, the physical abuse escalated and Teske began to physically abuse and neglect the children. Teske would slap them, hit them in the head and knock them over, shove them down onto the floor when they tried to get attention from him, especially when they interrupted perseverative video game playing.  He would also knock them off the furniture by kicking or shoving them. More shockingly, Teske began pulling down the eldest son's pants and hitting him with a closed fist and telling him he was *"an ungrateful piece of shit like his mommy."*

31.    Teske persistently disparaged Chagnon in the presence of their innocent children, relentlessly feeding them poisonous remarks about their mother's character and labeling her as a terrible person. These hurtful comments left the children bewildered and emotionally distressed, subjecting them to a level of emotional torment that no child should ever endure.

32.    Teske also displayed abusive behavior towards the family pet cat, once resorting to violence by kicking the cat against the wall, leaving him lifeless in the presence of the terrified children. On multiple occasions, Teske made threats to shoot the family cat in the presence of both the children and Chagnon.

33.    Teske frequently engaged in destructive actions out of anger as a favorite pastime, which included breaking items within the household, such as kicking or hurling glass, throwing a plate through the wall, and endangering the children playing nearby. On one occasion, Teske

violently kicked and shattered a 12-pack of glass beer bottles across the room where Chagnon and the children were present, citing dissatisfaction with the beer she had been told to purchase for him.

34.    The violence and or threat of violence had become so severe, the eldest child repeatedly asked Chagnon to keep his father from hurting him again.

35.    Around April 2017, the youngest then 2-year-old, experienced a significant fall while under Teske's supervision, necessitating hospital treatment for biting through his tongue. During this incident, Teske opted to stay at home and consume alcohol with a female colleague, he had on many occasions threatened to have sex with to spite of his wife, while Chagnon hurriedly took the child to the hospital, where he required several stitches.

### Protection From Abuse Order Against Teske

36.    On April 28, 2017, Chagnon submitted a Protection from Abuse Order ("PFA") against Teske due to ongoing instances of domestic violence throughout the marriage[2].

37.    Teske was served with summons on the Naval Base in Groton, CT, where he was away for work temporarily.

38.    In blatant violation of the no-contact order, Teske defied the PFA by promptly reaching out to Chagnon through messages, texts, and emails. He further appeared at the marital residence, imploring her to rescind the restraining order. He assured her that he would address his aggressive tendencies and anger, committing to attend counseling and support Chagnon in her aspiration to establish and buy a private school and daycare, contingent upon her compliance.

39.    In May of 2017, Teske forced Chagnon to dismiss the restraining order and recant her allegations against him. Under fear of duress and intimidation, Chagnon succumbed to

---

[2] Plaintiff began a Protection from Abuse Action against Defendant on behalf of herself and the minor children pursuant to 19-A.M.S. §§4001-4014 in the York District Court, Docket no. YORC-PA-2017 -0047.

Teske's demands.

40.     In June 2017, the charges and restraining order were dismissed.

41.     Chagnon also felt pressure from Teske's family members including Defendants Diederich and Gunter who had begun threatening Chagnon to drop the restraining order against him.

42.     In July 2017, Teske made good on his promise to help Chagnon find a property and set up a private school but failed on his commitment to attend counseling or address his aggressive behavior.

43.     Teske's drinking escalated the summer of 2017 and in early August 2017, due to increasing aggression by Teske and threats of infidelity, Chagnon demanded Teske move into their basement apartment. Chagnon remained upstairs with the children, with their bedroom doors locked for the night.

### Teske's Firearm Assault

44.     Horror struck once more –this time with a loaded firearm. Teske had been heavily drinking and broke the lock on Chagnon's bedroom door while she was sleeping, insisting that he need the loaded gun that was hidden in the bedroom.

45.     He claimed he thought he heard someone or something on the property, but instead once he obtained the gun, he proceeded to verbally attack Chagnon and wave the gun around terrifying her. He then put the gun to his head threatening to blow his brains all over the wall knowing that his children were in the adjacent room.

46.     The next day, Chagnon declared that the marriage was over and demanded that Teske move out of the marital home.

47.     Teske was infuriated, objected to the end of the marriage, and reluctantly moved out of the marital home. Teske took up residence over a bar and nightclub in Portsmouth, N.H., where he binge-drank and called and stalked Chagnon threatening to kill himself if she didn't permit him to move back in the marital home.

48.     Teske made repeated threats that he would kill himself if Chagnon didn't take him back including explicitly threatening that he would "blow his brains out".

49.     On September 6, 2017, Teske filed his complaint for divorce in York District Court, and Chagnon filed her Counterclaim for Divorce on September 12, 2017.

50.     Teske's threatening, and controlling behaviors only worsened after the separation.

**Defendants Gunter and Diedrich's Tortious and Complicit Conduct Against Chagnon**

51.     In April 2017, following the filing of the Protection from Abuse Order, Teske and his family, including his Mother Defendant, Brenda Diederich and ex stepsister Defendant, Amanda Gunter, escalated their hostile behavior towards Chagnon. Their concerted efforts aimed at tarnishing Chagnon's life and community standing, stemming from her exposure of Teske's abuse, with the primary objective of seeking retribution.

52.     Gunter, communicated both orally and through written messages and social media posts, cautioning Chagnon that persisting with charges against Teske would have severe consequences on her life.

53.     Gunter wrote:

*"If you continue to try and hurt Tegan and ruin his life it will only backfire. You will be alone, no job, no kids, no friends. You have fucked with the wrong family sweetheart. Not even your kids like being with you. Have a great life!"*

54.     Gunter's statement involves explicit threats and warning to Chagnon,

10

emphasizing the severity of the situation involving her brother Teske, and the protentional

consequences for Chagnon. Gunter's emotional intensity is evident through her profanity and

strong language reflecting the seriousness of her intentions to harm Chagnon if she persisted in

exposing her ex-stepbrother Teske.

55.     Gunter's warnings about potential isolation, loss of job, family, and friends was

driven by retaliation for Chagnon's reports of abuse by Teske and for her seeking a PFA against

him. Gunter's mention of Chagnon's own children not wanting to be with them implies a wish

for Chagnon to experience a sense of loss and loneliness, mirroring the perceived harm to Tegan.

56.     The defendants also engaged in harassment against Chagnon by circulating false

rumors suggesting she was unfaithful to Teske and treated the parties' minor children in an

abusive and neglectful manner.

57.     In addition, Defendant Gunter acknowledged in written communication the act of

placing  anonymous calls to law enforcement, reporting fabricated allegations about Chagnon.

58.     Both Gunter and Diederich also encouraged the police to conduct welfare checks

on the children, citing concerns about Chagnon's mental and emotional stability.   Chagnon and

the minor children were subjected to having armed police demanding to enter their home in the

middle of the night to "check on the children," causing a commotion and disrupting their sleep

by shining bright flashlights onto their beds.

59.     Diederich made calls to the planning board and town office in Eliot, Maine telling

them that Chagnon was of "immoral character" in attempts to sabotage Chagnon's request for

business license to build an integrated preschool for children with the developmental disabilities

and autism.

60.     Gunter falsely informed  law enforcement that Chagnon had posted on Facebook

claiming her husband, Teske was holding a gun to her head with intent to kill her.

61.    Gunter confessed in writing to orchestrating the anonymous calls and warned Chagnon that she had "*fucked with the wrong family*" and urged Chagnon to *meet her face to face".*

62.    Following this stream of threatening messages, Chagnon blocked Gunter on Facebook Messenger. Subsequently, Gunter replicated similar messages via text message to Chagnon, prompting Chagnon to block Gunter's phone number.

63.    Given Gunter's persistent and distressingly extreme actions aimed at Chagnon and her children, Chagnon experienced significant concern for her and her children's safety and overall welfare.

64.    Chagnon expressed these concerns to Teske who stated that he would "cut Gunter and Diederich off" and make it all stop if she would let him "come home."

65.    Subsequent to consulting with law enforcement, Chagnon initiated the process of obtaining a Protection from Abuse Order against Gunter on September 7, 2017.

66.    Defendants intended for their intimidation and unfounded accusations to inflict psychological and emotional anguish upon Chagnon.

67.    Defendants were cognizant that their deliberate and careless conduct would severely impact Chagnon's mental, emotional, and physical health, as well as her credibility when seeking aid from law enforcement and the judicial system.

68.    Furthermore, the Defendants were conscious that their inaccurate portrayal of Chagnon would strengthen Teske's stance in the divorce proceedings and in his criminal matter.

69.    The Defendant conspired to perpetrate this deliberate infliction of distress upon Chagnon, intending to harass, intimidate, and tarnish her reputation, with the aim of disrupting

her relationships, business, and obtaining a just resolution in the divorce proceedings.

70.     The Defendants, through their actions, violated Chagnon's privacy, severed her connections, and severely damaged her reputation, good name, and livelihood.

71.     The Defendants made false accusations against Chagnon, which have been conclusively disproven by official law enforcement reports, EMS and hospital records, court documents, government records, and numerous impartial third-party witnesses, including medical professionals.

72.     The Defendants were well aware of the harmful impact their allegations and actions would have on Chagnon, her personal and professional relationships, and her community standing, showing a callous disregard for truth as long as it harmed her.

73.     Due to the Defendants' behavior, Chagnon has endured and will continue to endure significant emotional and physical suffering.

74.     As a direct and immediate result of the Defendants' extreme and shocking and deliberate actions, the Plaintiff has been diagnosed with CPTSD (complex post-traumatic stress disorder), an anxiety-based disorder, panic disorder, and depression by multiple treating physicians and therapists, and a total and permanent disability through the United States Social Security Administration.

75.     The Defendants false claims about Chagnon's unstable character and alleged criminal involvement are not only provably untrue but also inherently damaging, qualifying as defamatory per se and warranting special damages. The Defendants wrongly accused Chagnon, among other things, of assaulting and battering a minor child, crimes involving moral turpitude.

76.     The Defendants' conduct was exceptionally heinous and egregious. Their actions were intentionally designed to cause Chagnon severe emotional suffering, demonstrating malice,

willfulness, and recklessness, displaying a conscious disregard for Chagnon's rights.

## November 2, 2017 Domestic Violence Assault By Defendant Teske

77.     On November 2, 2023, the parties had a scheduled mediation for finalizing their divorce proceeding.  The day before, Teske persuaded Chagnon via email to cancel the mediation and attempt to reconcile the marriage. Once again, Teske made promises to change, attend therapy, and reduce excessive drinking.  Chagnon was not convinced was capable of changing his behavior but considered giving Teske another chance.

78.     Chagnon was driven by a profound fear that if she severed the relationship, Teske's abuse might escalate to more dangerous levels. This fear was grounded in the realization that leaving an abusive partner can trigger heightened aggression and retaliation.

79.     Furthermore, financial concerns were a critical factor influencing Chagnon's decision. She feared that severing ties with Teske could plunge her and the children into financial instability, as she had likely been isolated from financial resources and support during the course of the abusive relationship. This financial dependency made the prospect of severing ties with Teske even more daunting, reinforcing her decision to give Teske another chance in the hopes of a better future for both their marriage and she and the children's financial well-being.

80.     After work on November 2, 2023, Teske went to the marital residence claiming that he needed to get some of his "warm weather gear from the basement."  Upon arrival Teske began drinking and love bombing Chagnon.  He stated that he wanted to spend the night there so that he wouldn't have to drive back to his apartment in Portsmouth intoxicated.

81.     Throughout the evening, the parties engaged in arguments. Later, as they went to bed, Teske's phone received numerous messages from another woman, causing distress to Chagnon Upon reviewing the messages on Teske's phone, she confronted him. Teske reacted

angrily and aggressively, seizing Chagnon's wrists and forcibly twisting them. Chagnon who saw the rage in Teske's eyes, feared for her life and tried to defend herself by kicking him to free her wrists.

82.    When Chagnon said she was calling the police, Teske then left the house with Chagnon's phone to obstruct her from reporting the assault.

83.    Chagnon called 911 for help with a 2nd phone. When the police arrived, Teske was walking down a path from the front door of the house to greet the officers. He falsely claimed that Chagnon had been the initial aggressor and had kicked him, leading him to leave the residence. Teske also portrayed Chagnon as crazy and the aggressor, or words to that effect.

84.    The responding officer encountered visibly upset and crying Chagnon. Obvious marks on her wrists were observed, resulting from Teske's gripping. Chagnon disclosed a prior assault by Teske just two days earlier at his apartment, where he had similarly grabbed her wrists, causing harm.

85.    Consequently, Teske was arrested and charged with Domestic Violence Assault (17-A M.R.S. A. §207-A(1)(A) and obstructing report of a crime (17-A M.R.S. A. §758). It was determined that Teske's conduct was committed against a family or household member as defined by 19-A.M.R.S.A. §4002(4).

86.    On November 21, 2017, Teske plead guilty during the arraigned in York County District Court, Maine, Docket No. 17-4-41104.

87.    Despite bail conditions that prohibited contact with Chagnon, Teske immediately called Chagnon the night he posted bail and began threatening, coercing, bribing and manipulating Chagnon into dropping the charges after his arraignment.

**Teske's Fabricated and Coerced Email and Statement**

88.     On or about November 27, 2018, during which time Teske had just been arraigned on the November 2, 2017 domestic violence assault, Teske deceitfully composed an email to create the appearance that Chagnon had authored it, retracting her previous statements made to the police. (See email attached hereto and incorporated herein as **Exhibit A**)

89.     The email falsely contended that Chagnon was exaggerating and had initiated the November 2, 2017 domestic violence assault incident.

90.     Teske intended to provide this email purportedly written by Chagnon to both the police and his employer with the aim to get the charges against him dropped and to secure his position at the United States Navy Shipyard where his "top-secret clearance" was at risk.

91.     Teske resorted to coercion, leveraging the dire circumstances that Chagnon could face if she did not submit to his demands and endorse the email.

92.     Teske explicitly conveyed that if he were convicted and imprisoned, Chagnon would confront the grim prospects of homelessness, the loss of her business, property, and her capacity to provide for herself and her children. This severe financial manipulation significantly limited her options to break free from the cycle of abuse, forcing her into compliance against her own will.

93.     Then, to further augment his email forgery and underscore Chagnon's retraction of abuse allegations, on March 3, 2018, Teske resorted to identical tactics. He employed threats and instilled fear in Chagnon, compelling her to sign a statement in front of a notary public that affirmed his deceptive assertions, mirroring the content of the falsified email.  (see the statement, attached hereto, and incorporated herein as **Exhibit B**)

94.     Teske used threats of harm via a loaded pistol he claimed he had concealed from the police when they removed over a dozen firearms of Teske from the Eliot residence and other

weapons he had access to as an officer at the Naval Shipyard.

95.    Subsequently, Teske sent this letter to the Eliot police and his employer at the Portsmouth Naval Shipyard, signing Chagnon's name and the court docket number to the statement.

96.    The statement incorrectly asserted that Chagnon harbored no safety concerns for her family and urgently requested the dismissal of charges against her husband.  Teske sent the email to the Eliot police department and the Portsmouth Naval Shipyard

97.    Teske's forgery and coercive actions were calculated, malicious, and aimed at damaging Chagnon's credibility while seeking to absolve himself of criminal liability and moral accountability all at the expense of injuring Chagnon.

98.    The creation of the deceptive email by Teske, coupled with his coercive threats to force Chagnon to sign a letter conveying the same false representation of her views and actions, clearly qualifies as an invasion of privacy in Maine.

99.    Teske's deceptive email and letter unequivocally falls under the category of "intrusion upon the plaintiff's physical and mental solitude or seclusion," as outlined in the tort of invasion of privacy, which aims to protect individuals from such violations of their personal boundaries.

100.    Teske's deceptive email and letter encompass the following elements of the tort of invasion of privacy: they are 1) intentionally crafted to misrepresent Chagnon's views, 2) entail a physical intrusion into her personal and private communications, 3) occur within premises occupied privately by Chagnon for purposes of seclusion, and 4) the intrusive actions are undoubtedly highly offensive to any reasonable person, thereby constituting a clear violation of her privacy rights.

101.    Moreover, the contrived email and letter were not only instrumental in dismissing Teske's domestic violence assault case but were also decisive in preserving his employment at the US Navy Shipyard.

102.    On March 18, 2018, Teske agreed to a plea deal utilizing deferred disposition for the domestic violence assault charge.

103.    Teske's conduct constituted a clear violation of Chagnon's privacy rights. The fabrication of the email and coercing Chagnon to sign a misleading letter were intentional actions that invaded her mental and physical solitude, infringing upon her privacy within the context of the tort of invasion of privacy.

104.    Such intrusions were highly offensive and were perpetrated within premises privately occupied by Chagnon for seclusion.

105.    This violation underscores the critical need to uphold privacy rights and maintain public policy that safeguards individuals from such invasive breaches.

106.    The consequence of Teske's actions were severe for Chagnon, extending beyond the invasion of her privacy.

107.    The fabricated email and coerced letter not only distorted the truth but had far reaching ramifications on Chagnon's life and the credible threats posed by Teske. The false narrative undermined Chagnon's credibility in the eyes of both law enforcement and the court.

108.    Chagnon, already a victim of domestic violence, suffered immense legal and emotional damages due to Teske's deceitful tactics. The falsified email, purportedly from her, discrediting her previous statements, casted a shadow of doubt on her veracity.

109.    The erosion of credibility has made it increasingly challenging for Chagnon to seek justice for any subsequent incidents of domestic violence perpetrated by Teske, as well as in

her attempts to extinguish past and present PFAs against her, and most critically, in her effort to reunite with her children.

110.    It is vital to recognize that the invasion of privacy perpetrated by Teske extended beyond the immediate incident. The psychological distress and harm inflicted on Chagnon were compounded by the erosion of her credibility, leaving her in a vulnerable position, unable to confidently reach out for help and protection in the face of domestic violence and in attempting to protect her children.

### The May 13, 2018 Orchestrated Assault By Defendants Gunter And Teske

111.    On May 12, 2018, at the marital residence in Eliot, Maine, Teske arrived, bearing gifts and flowers, presenting an image of attempting reconciliation, a façade he had maintained on numerous prior occasions. However unbeknownst to Chagnon, Teske and Gunter had devised an elaborate scheme aimed at provoking Chagnon to a state of anger and distress, with the sinister intention of orchestrating a brutal attack on Chagnon and framing her as the aggressor.

112.    Despite being under bail conditions that explicitly barred any direct or indirect contact with Chagnon, Teske consistently and arrogantly flouted these court orders, behaving as if he were beyond the reach of the law.

113.    The following day, Mother's Day (May 13, 2018), Teske took Chagnon and the children to a Mother's Day brunch near his apartment in Portsmouth, N.H. Teske had invited Chagnon and the children for the purpose of "making up for all the other Mother's Days he had treated her horribly "and "doing something nice for her and children."

114.    During the morning and afternoon, Teske excessively consumed alcohol and deliberately provoked Chagnon, leading to an argument regarding his purported interest in reconciliation of the marriage and his involvement with other women.

115.   The discord culminated in Chagnon leaving the brunch with the children, intending to retrieve their belongings from Teske's apartment before returning home to Eliot.

116.   Teske remained at the local establishment, Book N' Bar, consuming alcoholic beverages reveling in the emotional turmoil he had instigated.

117.   Upon entering the apartment, Chagnon discovered staged love letters and condoms deliberately planted by Teske to provoke her anger. Chagnon recognizing the brunch as another deceit and manipulation of Teske, proceeded to tear up the letters, empty liquor bottles, and disperse the condoms in the room.

118.   Chagnon called Teske, expressing her anger regarding his infidelity and claims of desiring reconciliation. Teske, under the influence and offensive, responded belligerently.

119.   Teske then headed home and contacted Defendant Gunter, his ex-stepsister, known for her spiteful and jealous behavior toward Chagnon, requesting her assistance in "cleaning up" the torn love letters in his apartment.

120.   Teske's plan was to intentionally agitate Chagnon with planting love letters and condoms around the apartment for her to find. Teske was well aware that this would deeply upset Chagnon, and he also knew that involving Gunter, whom Chagnon had expressed fear of due to her history of aggressive threats would further inflame the situation, effectively pouring gasoline on the already volatile situation. This provocation was a clear motive for Gunter's presence at the apartment, and it was executed with full knowledge of Chagnon's apprehensions and past interactions with Gunter.

121.   Gunter was aware of Chagnon's presence at the apartment, and that she had previously sought a Protection from Abuse order against Gunter due to harassment and stalking incidents a few months before in September 2017.

122.    Defendant Gunter arrived 20 minutes after being summoned by Teske, accompanied by her two minor children including her ten-month-old daughter entered the apartment with full knowledge Chagnon was inside and proceeded to follow Chagnon around the apartment. Gunter began verbally insulting and disparaging Chagnon before physically attacking her when she tried to leave with her son, violently punching her in the face (causing permanent orbital trauma, persistent pain, and problems with her vision), and strangling her to near asphyxiation in front of the minor children.

123.    At the time of the assault, Teske was hiding downstairs but came upstairs upon hearing Chagnon's cries for help and his son's account of the fighting. He intervened by pulling Gunter off Chagnon and instead of helping Chagnon who had been horribly injured, proceeded to take joy in recording the aftermath of his plan to ruin Chagnon on his cell phone.  Gunter took this as her cue from Teske to play "victim," falsely alleging Chagnon had harmed her child on camera.

124.    Chagnon had left the apartment as soon as she could get away from Gunter and ran out of the apartment with her children to safety and called 911 for help.  Portsmouth Police were called to the scene.

125.    The responding officers documented Chagnon's multiple injuries, including a bloodied and swollen left eye, deep bruising and strangulation marks around her neck, and bruising on other parts of her body. Chagnon was taken to Portsmouth Regional Hospital for examination and treatment.

126.    The investigating officers documented that Gunter, and her minor child were unharmed. The child did not require transport or treatment, nor did she appear to be in distress according to Teske. Tegan also admitted in his own statement to the police that his wife would

never hurt a child.

127.    Gunter falsely informed law enforcement that Chagnon initiated the altercation and hit Gunter's daughter. She falsely claimed to act in defense of her daughter, admitting to strangling Chagnon, even gloating about how much bigger and stronger she was as a 160lb fitness strength trainer, in comparison to Chagnon, a 108lb preschool teacher.

128.    The officers stated in their reports that they did not find Gunter to be credible and did not find Chagnon to have acted aggressively towards Gunter or her child.

129.    The investigating officers also concluded that Gunter and Gunter's minor child were unharmed (emphasis added), and the child did not require transport or treatment.

130.    Gunter was therefore arrested and charged with two felony strangulation charges and 2 charges of aggravated assault.

131.    The series of events leading up to the Mother's Day assault strongly suggest a premeditated plan orchestrated by both Teske and Gunter. Teske's calculated actions on May 12, presenting gifts and flowers to Chagnon, followed by a carefully chosen Mother's Day brunch location near his apartment, set the stage. His excessive drinking during the brunch was a deliberate ploy to heighten tensions and create a confrontational atmosphere for what was to come if Chagnon did not agree to rekindle the marriage.

132.    Additionally, Teske's phone call to Gunter requesting her assistance in "cleaning up the apartment" was a planned collaboration. The subsequent arrival of Gunter, with her minor children including a ten-month old daughter, was a coordinated effort to involve innocent minors in a premeditated act of violence, further emphasizing the calculated nature of the assault.

133.    The timing of Gunter's arrival, precisely 20 minutes after Chagnon had been in the apartment, suggests careful coordination between Teske and Gunter to synchronize their

actions. Gunter's deliberate choice to attack Chagnon in front of her children on Mother's Day illustrates a well-thought-out strategy to maximize the emotional and psychological impact of their assault.

134.    Ultimately, the evidence paints a compelling picture of a planned and malicious attack on Chagnon, designed by both Teske and Gunter to not only physically harm her but also to distort the truth and cast her as the aggressor.

135.    Text messages between Teske and Gunter demonstrate clear evidence of an intent to entrap Chagnon, a conclusion drawn by the DHHS worker, Kathleen Nadeau, who called it a "set up "after reviewing the text messages as part of her investigation.

136.    Defendants intended to cause harm, leaving no doubt about the premeditated nature of the Mother's Day assault.

137.    Chagnon suffered both temporary and permanent physical injuries as a result of the assault as well severe emotional distress that plagues her to this day.

138.    Chagnon submitted a Harassment Protection Complaint on May 14, 2018, immediately following  the incident on May 13, 2018, expressing her deep concern for her safety and the safety of her children.

139.    Gunter initiated a competing Protection From Abuse (PFA) petition against Chagnon strategically, primarily as a preemptive measure aimed at bolstering her defense against the felony charges. This move was not rooted in genuine merit concerning her claims against Chagnon.

140.    The competing PFA filing by Gunter was a calculated legal maneuver to manipulate the legal process. By doing so, she aimed to create a diversion or mitigate the potential impact of the impending felony charges, potentially attempting to shift the focus from

her own actions during the assault incident.

141.    The intention behind this strategic move was not to seek actual protection or address any legitimate concerns related to harassment. Instead, it was a tactical step intended to alter the narrative and legal dynamics in her favor.

142.    In fact, the narrative of Gunter has dramatically changed each time she has told her story, adding more embellishments to make Chagnon look like a monster knowing full well the impact it would have on her career as a teacher who works with children.

143.    The Defendants' concerted actions directly and proximately resulted in harm in physical, emotional, and financial damages. Their actions also resulted in Chagnon's near death experience that triggered post-traumatic stress disorder that persists to the present day. Additionally, Chagnon experienced lasting damage to her left eye, and lost her license to operate her successful day care business, resulting in significant economic loss.

### Teske's Continued Abuse

144.    Notwithstanding his recent domestic violence assault case,  Teske continued to abuse Chagnon physically and emotionally and the minor children throughout the remainder of 2018 and 2019 until her departure from Maine in October of 2019.

145.    Teske assaulted Chagnon again in August 18, of 2018 causing bruising to her face and hand.  He them claimed Chagnon "hit herself" and threatened to make her look "crazy' and with the aim of taking  custody of the children. Teske went as far as making a false report to the police documenting this lie about Chagnon hitting herself.

146.    In this period, Teske used intimidation tactics, openly threatening Chagnon to gain custody of the boys while telling the children that he had found a replacement mother for them.  Additionally, Teske demeaned and verbally disparaged Chagnon in front of the children.

147.    Teske verbally acknowledged responsibility for the abusive actions and mistreatment towards Chagnon over the course of their marriage and separation.

148.    The concept of a trauma bond is evident in this situation, illustrating the intricate dynamics that develop between an abuser and the victim. Chagnon's love was unconditional, and Teske exploited Chagnon's empathy and boundless loyalty for personal gain.

149.    Chagnon sought out the help of local law enforcement and other agencies for Teske's lies and repeated acts of violence, but unfortunately, no effective action was taken.

150.    Chagnon also notified authorities about Teske violating his bail conditions related to the domestic violence assault. However, these reports did not yield any tangible results.

151.    On or about April 2, 2019, the parties' youngest child disclosed incidents of physical abuse by his Father, Teske,  who had struck him with a closed fist and pushed him off a sofa. His disclosures were later found to be credible by the child's therapist and also by a GAL who interviewed both children, who reported being hit, kicked, pushed, and fear of dad, but did nothing to safeguard them from further harm.

152.    The children also disclosed that Teske had been drunk and heavily drinking during visits with their dad and that he lashed out physically scaring them.  This alarming situation,  prompted Chagnon to submit a Protection for Abuse Order on August 9, 2019, seeking protection for her sons. Chagnon reported the disclosures to the Department of Children Services, expecting necessary intervention and protection.

153.    In the PFA hearing, Teske and his counsel intentionally ran the clock pretending they were going to come to an agreement to avoid trial ultimately, leaving almost no time for Chagnon's crucial witnesses to testify.

154.    Regrettably, the courts, law enforcement and the Department of Children's

services failed to treat these discloses with the gravity they warranted. The inadequate recognition of domestic violence and intimate partner violence is symptomatic of a systemic issue stemming from a lack of training and awareness. Consequently, children and women endure the harrowing consequences, deprived of the essential support and protection that should be provided by the authorities, family courts, and Child Protective Services. This oversight perpetuates the cycle of abuse and amplifies the suffering of those affected.

155.    In a desperate effort to secure her safety and the safety of her children, Chagnon left for Canada on October 31, 2019 seeking refugee protection which she applied for after crossing the border.

156.    Coinciding with Chagnon's urgent departure to Canada with the children to escape domestic violence, she received a disability determination from SSDI, which is dated the same date she fled with the children 10/31/2019.

157.    This determination was based on her diagnosis stemming from years of enduring sustained physical sexual and emotional abuse inflicted by Teske and his family. This decision was based on the prolonged domestic terror she had experienced and the lack of assistance from authorities in Maine.

158.    The Canadian Government approved their request for refugee protection on December 9, 2019 . Shockingly, a day prior, four-armed Canadian law enforcement officers, informed and misled by Teske, forcibly seized the children.

159.    Canadian law enforcement was falsely warned, by Teske's attorney that Chagnon was armed and posed a threat to both her and the children. In a horrifying awakening, Chagnon found herself facing a loaded gun to her temple while three other officers had additional weapons aimed at her.

160.   The children were brought back to the United States following Teske's request made under the Hague Convention through the US State Department. However, in his application, Teske provided false information and deliberately omitted the years of domestic violence and the immediate danger the children faced from Teske.

161.   The proper protocols implemented via the treaty were not respected and Chagnon was not given the opportunity to defend Teske's allegations.  This is a violation of the international treaty and is another issue being addressed by Chagnon and her lawyers in Canada.

162.   Chagnon withdrew her refugee protection immediately after the children were taken and voluntarily returned to the U.S, because she would not allow herself to be separated from the children.

163.   The tragic aftermath of this failure to protect Chagnon and the children and then the failure to adhere to the Hague Convention exacerbated the already dire circumstances Chagnon faced for removing the children from Maine.

164.    Notably, in the divorce proceedings, Teske was granted everything he asked for, including sole custody and all marital assets, including Chagnon's  property and business, their home, and her corporation which Teske's name legally wasn't on, not to mention Chagnon's business was purchased after the parties' separated and was purchased with 98 percent of Chagnon's personal assets, despite Maine being a 50/50, "no fault" state.

165.   This unjust turn of events, coupled with Defendants' damaging narrative portraying Chagnon as a criminal and liar regarding the domestic violence, particularly the November 2, 2018  domestic violence assault case and the Mother's Day attack on Chagnon, further undermined her credibility and discretion in the eyes of the law and public perception.

166.    As a direct and proximate result of Defendants' conduct, Chagnon has suffered significant actual and special damages, including without limitation, permanent physical harm, harm to her reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

167.    As a result of Defendants' actions, Chagnon endured and continues to endure mental and emotional pain and suffering, fear, anxiety, humiliation, embarrassment, indignity, public disgrace, and loss of her relationships and familial ties  as well as loss of reputation within her community.

168.    Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Chagnon's rights. Accordingly, punitive damages are appropriate.

## COUNT I

### INVASION OF PRIVACY
### (As to Defendant Teske)

169.    Plaintiff fully incorporates the foregoing allegations as though fully set forth herein.

170.    On or about November 27, 2017, Defendant Tegan Teske in violation of his bail conditions, intentionally and without right, intruded upon the seclusion and privacy of the Plaintiff, Sarah M. Chagnon, by crafting a fictitious and untrue email and using her name to transmit a false statement to the Eliot Police Department and his employer at the Portsmouth Navy Shipyard.

171.    Further, on or about March 3, 2018, the Defendant coerced Plaintiff under threats of harm into signing  a statement that distorted facts concerning his domestic violence assault case. This misleading statement falsely asserted that Chagnon desired to retract her previous statements to law enforcement regarding the November 2, 2017 assault.

172.    Teske's actions were taken with the explicit intent to invade Plaintiff's private identity and communications.

173.    On or about November 27, 2017 and March 3, 2018, Defendant Teske disseminated his fabricated email and statement to the Eliot Police Department and his employers at the Portsmouth Navy Shipyard.

174.    Defendant's intrusive actions are undoubtedly highly offensive to any reasonable person, thereby constituting a clear violation of her privacy rights.

175.    As a direct consequence of Defendants invasion of privacy, Plaintiff, Sarah M. Chagnon was subjected to embarrassment, ridicule, mockery, public scorn, and profound devastation to her reputation and credibility in addition to suffering extreme mental and emotional distress which has manifested itself in physical distress, loss of health and permanent disability.

## COUNT II

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (As to All Defendants)

176.    Plaintiff fully incorporates the foregoing allegations as though fully set forth herein.

177.    Defendant Teske's conduct towards Plaintiff was extreme and outrageous.

178.    Defendant Teske intentionally and unlawfully inflicted physical violence and verbal and emotional abuse on Plaintiff before, during and after the parties' divorce as set forth above.

179.    Defendant, Teske did intentionally and unlawfully and without right intrude upon the seclusion of the Plaintiff and did by means of crafting a fabricated email and statement and

coercing Plaintiff's signature under duress, did unlawfully transmit both to law enforcement and his employer without the consent of Plaintiff.

180.    Defendants Amanda Gunter and Brenda Diedrich's conduct toward Plaintiff was extreme and outrageous.

181.    Defendants intentionally and unlawfully engaged in harassment, threats to destroy her life, and verbal attacks against Plaintiff Chagnon. Further, Defendants actively endorsed Teske's domestic violence, concealing it from law enforcement and deliberately claiming that Chagnon was the abuser and labeling her as a criminal, as set forth above.

182.    Defendant Amanda Gunter intentionally brutally attack Plaintiff,  violently punching her in the face causing permanent orbital trauma and choking her to near asphyxiation in front of her minor children on May 13, 2018, as set forth above.

183.    Defendant Gunter sought to portray Chagnon as the perpetrator and falsely accused Chagnon of assaulting her minor child. She did so by offering false testimony in a deliberate attempt to evade criminal charges, which she managed to successfully accomplish.

184.    Subsequently, Defendant Gunter secured a Protection From Abuse (PFA) order against Chagnon based on her false statements, and perjured testimony, adding to the injustices perpetrated against Chagnon.

185.    Defendant Teske capitalized off of Gunter's false claims to gain a strategic financial, legal, and tactical advantage in the divorce proceedings by portraying Chagnon as a "child abuser," which he knew was not true.

186.    Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency. It should be regarded as atrocious and determined intolerable in a civilized community.

187.    Defendants' actions were deliberately calculated to cause Chagnon severe emotional distress and physical harm.

188.    The actions of Defendants, both jointly and severally, have directly and proximately caused Chagnon to endure both actual and special damages, including but not limited to severe emotional distress, permanent physical and mental impairment, extreme stress and anxiety, loss of income, deprivation of property, revocation of her daycare license loss of familial ties, public scorn, hatred, and other pecuniary loss.

## COUNT III

### CIVIL CONSPIRACY
### (as to all Defendants)

189.    Plaintiff fully incorporates the foregoing allegations as though fully set forth herein.

190.    From November 2, 2017 and persisting until the parties were divorced, the Defendants, Teske, Gunter, and Diederich systematically orchestrated a relentless and malevolent campaign, as set forth above, with the deliberate intent to unleash severe emotional distress upon Chagnon, subjecting her to torment, and purposefully shattering her life, livelihood, assets, and parental rights over her own children during the divorce proceedings.

191.    This heinous plan intricately crafted by Defendants and driven by Teske, with the despicable purpose of obliterating Chagnon while striving to salvage Teske's reputation and ensuring his escape from the clutches of incarceration for domestic violence assault and safeguarding his career in the US Navy at Portsmouth Naval Shipyard, notwithstanding his vile history as a violent abuser.

192.    Defendants' actions were not isolated; the Defendants formed a pattern of calculated and overt acts, where each Defendant played a specific role, as more fully set forth

above. Teske, Gunter, and Diederich meticulously coordinated their efforts, leveraging their influence, resources, and hateful intent to systematically harass, threaten, defame, invade her privacy, and physically assault Chagnon.

193.    Defendant Diederich eagerly joined forces with Teske and Gunter, engaging in aggressive harassment, defamation,  interfering with Chagnon's business and solitude. Additionally, she made false reports to law enforcement, requesting welfare check at Chagnon's home in the middle of the night and making false reports to the planning board, and the town office in Eliot.

194.    Defendant Gunter eagerly aligned herself with Teske, ruthlessly threatening Chagnon's life and assaulting Chagnon on the sacred day of Mother's Day, May 13, 2018, intensifying the trauma inflicted upon Chagnon.

195.    The assault orchestrated on Mother's Day, May 13, 2018, had lasting physical repercussions on Chagnon, leaving her with permanent injuries and enduring pain.

196.    The Defendants Gunter and Teske, as part of their plan to torment Chagnon, agreed to falsely report and testify that Chagnon was the first aggressor and had attacked Gunter's daughter during this assault- a complete lie manufactured to further destroy Chagnon and excuse Gunter for her criminal aggression.

197.    The Defendants' dissemination of a false narrative about Chagnon was designed to severely damage her reputation in legal proceedings, with law enforcement and within her community, with the intention of causing profound consequences for both her personal and professional life.

198.    The parties' agreement to inflict emotional distress on Chagnon was fueled by the Defendants' deep-rooted fear and resentment  of Chagnon's courage to report  Teske's domestic

violence to the authorities. This fear of exposure drove them to conspire against Chagnon, retaliating in a grotesque attempt to silence her and punish her for seeking justice and safety for herself and her children.

199.    Teske, Gunter, and Diederich shared an objective to terrorize and destroy Chagnon's life, a conspiracy that must be held accountable for the immense suffering and damage inflicted upon Chagnon.

200.    Their vindictive desire was to make Chagnon pay dearly for daring to expose the truth about Teske's reprehensible behavior and for championing justice and safety for herself and her innocent children.

201.    As a direct and proximate result of Defendants conduct Chagnon has suffered significant actual and special damages, including without limitation, emotional distress, permanent physical injuries, overwhelming stress and anxiety, lost earning, loss of property, loss of familial ties, and other pecuniary loss.

202.    Most tragically, the conspiracy targeted Chagnon's children, disrupting their lives and subjecting them to emotional trauma. The Defendants' actions in jeopardizing Chagnon's custodial rights inflicted deep emotional scars on the innocent children, compounding the overall distress and harm caused by this heinous conspiracy.

## COUNT IV

### NEGLIGENT INFLICTION OF EMOTION DISTRESS
### (As to Defendant Teske)

203.    Plaintiff fully incorporates the foregoing allegations as though fully set forth herein.

204.    The Defendant had a legal obligation to maintain and secure his premises to prevent harm or distress to Chagnon who was legally present at his residence.

205.    Instead of fulfilling his obligation to protect Chagnon, Teske purposefully orchestrated a dangerous confrontation on his premises, knowing it could lead to significant harm to Chagnon.

206.    Teske accomplished this by inviting Gunter, Chagnon's sworn adversary to intervene in the parties' marital dispute, someone who had demonstrated clear hostility towards Chagnon and prompting her to seek a Protection From Abuse order many months before.

207.    Defendant knew that Chagnon feared Defendant Gunter and yet purposefully summoned her to his apartment to force a confrontation with Chagnon and exacerbate her distress.

208.    The Defendant's conduct was intentional and was carried out with the purpose of causing severe physical and emotional distress to the Plaintiff.

209.    Defendant was obligated to ensure the safety of Plaintiff on his premises and, by failing to do so, breached this duty.

210.    The Defendant's actions directly resulted in Chagnon being brutally beaten suffering permanent orbital trauma to her left eye, profound bruising to neck,  head and body and severe emotional and psychological trauma and distress.

211.    As a direct and proximate result of Defendants conduct Chagnon suffered significant actual and special damages, including without limitation, emotional distress, permanent physical injuries, overwhelming stress and anxiety, lost earning, and other pecuniary loss.

## V. <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial to a jury on all issues so triable.

## VI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court enter Judgment in Plaintiff's favor

on all counts of her Complaint and against Defendants jointly and severally, consisting of:

      (1) Preliminary and permanent injunctive relief enjoining Defendants from

threatening, harassing, and making false statements against Plaintiff;

      (2) Compensatory and consequential damages, including loss of familial association,

psychological trauma, emotional distress, humiliation, loss of enjoyment of life, and other

pain and suffering on all claims allowed by law in an amount to be determined at trial;

      (3) Monetary damages for all economic and noneconomic losses on all claims as allowed by

law in an amount to be determined at trial;

      (4) Punitive damages on all claims allowed by law in an amount to be determined at trial;

      (5) Costs associated with this action on all claims allowed by law;

      (6) Prejudgment and post-judgment interest; and

      (7) Such other and further relief, both general and special, to which Plaintiff may be

        justly entitled to receive.

Respectfully submitted this 16th Day of October, 2023

*October 16th, 2023*

_h M. Chgn_
Sarah M. Chagnon
Plaintiff Pro Se
P.O. Box 44
Stratham, NH 03885
Phone: (603) 406-1261
prettypapertigers@gmail.com